JOHN J. SLATE, SR. vs. BETHLEHEM STEEL CORPORATION
(and a companion case[1]).

Essex. February 19, 1986. — August 13, 1986.

Present: ARMSTRONG, PERRETTA, & DREBEN, JJ.

*Negligence,* Manufacturer, Duty to warn, Imputed. *Practice, Civil,* Judicial
discretion, Failure to make objection. *Evidence,* Judicial discretion, Ex-
pert opinion.

At the trial of actions brought by a machinist and his wife as a result of serious
injuries sustained by the machinist in the course of his employment by
a manufacturer of jet engine components while testing a machine that
had been designed for the manufacturer by a highly-qualified engineer
and that had been repaired by a machine shop of the defendant at the
request of the engineer, the evidence was insufficient to warrant a finding
that the defendant should have warned the manufacturer's employees
directly about the dangerous character of the machine. [645-647]
At the trial of an action for loss of consortium by the wife of a machinist who
had been seriously injured in the course of his employment while testing
a machine under the supervision of a highly-qualified engineer who had
designed the machine for the machinist's employer, evidence of the
business relationship between the engineer and the employer was suffi-
cient to warrant a finding that the employer could be held liable for any
negligence by the engineer in his work for the employer. [647-650]
On appeal from a judgment for the plaintiff in an action for loss of consortium
resulting from serious injuries sustained by the plaintiff's husband in
the course of his employment by the defendant, there was no merit to
the defendant's contention that it was unfairly surprised and prejudiced
by evidence from three experts about whom it had been given no notice,
where, with respect to one witness, the judge stated that he was willing
to rearrange the order of testimony to give the defendant's counsel a
"full opportunity to prepare" for cross-examination; where, with respect
to a second witness, there was nothing in the record to show that counsel
had requested and been denied an opportunity to cross-examine the
witness, whose testimony, in any event, was admitted solely against a

---

[1] Catherine M. Slate vs. Aero Manufacturing Corporation & another. In
this action, Bethlehem brought a third-party complaint against Aero for
contribution.

codefendant; and where, although the defendant had received no notice respecting the testimony of a third witness, it had received notice concerning the testimony of a witness for the codefendant who was to testify concerning the same subject. [650-651]

CIVIL ACTIONS commenced in the Superior Court Department on June 20, 1979, and July 29, 1981, respectively.

The cases were tried before *John P. Forte,* J., sitting under statutory authority.

*Neal C. Tully* for Bethlehem Steel Corporation.

*James P. Keane* for Aero Manufacturing Corporation.

*Patrick T. Jones (Thomas G. Guiney* with him) for the plaintiffs.

PERRETTA, J. On October 26, 1978, John Slate was seriously injured in the course of his employment with the defendant Aero Manufacturing Corporation (Aero) while operating a machine that recently had been repaired by the defendant Bethlehem Steel Corporation (Bethlehem). He brought an action against Bethlehem in negligence based on two theories: (1) that Bethlehem had repaired the machine negligently, and (2) that Bethlehem had failed to warn of the dangerous character of the machine. Catherine Slate brought actions against Bethlehem and Aero, alleging a loss of consortium. In response to special questions, the jury found that Bethlehem and Aero had been negligent and that their negligence had caused John Slate's injuries and Catherine Slate's loss of consortium. On Bethlehem's appeal, we conclude that there was insufficient evidence upon which the jury could have found that Bethlehem had been negligent by reason of failing to warn about the dangerous character of the machine. Because we do not know upon which of the two theories of liability Bethlehem was found to have been negligent, we reverse the judgments as to Bethlehem. Finding no error in the proceedings as to Aero, we affirm that judgment.

1. *The Facts.*

Aero specializes in the manufacturing of jet engine components which are made from high-strength metals resistant to oxidation and corrosion. Sometime in the mid-1960's, Aero's

president, Michael Fonzo, became acquainted with Everett Conrad Alexander, an engineer by training with vast experience in metallurgy, metal working, and metal fabrication. As described by Fonzo, Alexander's "expertise followed him through nuclear applications, aerospace applications, and anything . . . that had to do with metals." He was an expert in all phases of the design and production of metal parts and machinery to shape metal. In superlative terms, Alexander was a "genius when it comes to metalworking."

In April of 1977, Alexander became a "technical consultant" to Aero. He was paid $600 a week as a "retainer" so that Aero could turn to him for help with any processes with which they were having problems. Alexander had an office on Aero's premises. A year later Alexander became a sales representative for Aero, and he was paid $700 a week as an advance on a five percent commission he would receive on all sales generated by him. In addition to securing contracts for parts needed in the aerospace industry, Alexander was to design and develop any equipment necessary for the manufacture of those parts.

Sometime in early 1978, Alexander secured for Aero a contract to design and fabricate a metal part for aircraft engines. The metal to be used was of such high strength that conventional presses and stamp dies were inadequate to form the metal into the required parts.

To meet this problem, Alexander conceived and designed an isostatic press[2] which consisted of a steel cylinder and a steel rod for insertion in the cylinder. The rod would have a slot or chamber in which the metal could be formed. The cylinder and rod were manufactured to Alexander's specifications by a forging and casting company located in Michigan, and delivered to Aero in June, 1978. The rod and cylinder, along with other necessary parts, were assembled at Aero by its personnel under Alexander's supervision.

---

[2] It is not necessary to this opinion to describe the press and its principle. It is sufficient to state only that it is a machine which exerts pressure, in this instance water pressure, on all sides of an object sealed in the chamber within the machine.

Among Aero's employees working on the press was John Slate, Aero's general foreman. Slate was a machinist and expert metal worker with thirty-seven years' experience. In late 1977, he had been directed by Fonzo to give Alexander any assistance he might request on any Aero projects. Shortly after the components of the isostatic press had been delivered to Aero, Alexander familiarized Slate with the basic principles of the press and what it was intended to do. Slate knew that Alexander needed and wanted the machine to generate 60,000 to 65,000 pounds of pressure per square inch to emboss the airplane engine parts.

After the press parts had been assembled and while it was being tested, a seal at one end of the rod gave way under 40,000 pounds of pressure per square inch. The seal extruded into the space between the rod and the cylinder, causing the rod to jam. Alexander and Slate could not dislodge the rod.

Alexander knew that Bethlehem's machine shop in East Boston had a horizontal press that could move the rod from the cylinder. On September 28, 1978, the rod and cylinder were delivered to Bethlehem and pressed apart. The next day Alexander went to the machine shop and spoke with the foreman, Raymond Johnson. He asked Johnson to enlarge the grooves on the rod to accommodate larger seals, and to drill a hole eighteen inches deep in one end of the rod, leaving six inches of steel between the hole and the chamber. Alexander testified[3] that he drew a sketch, which he left with Johnson, showing how he wanted the hole to be drilled.[4]

When Alexander returned to the machine shop several days later, he discovered that the hole had been drilled all the way into the chamber rather than stopping six inches short of it as

---

[3] Alexander was not a witness at trial, and his deposition was read to the jury.

[4] The evidence concerning what instructions Alexander gave to Johnson and whether he gave him a sketch is conflicting. Resolution of the conflicting evidence would be pertinent to the question of negligent repairs by Bethlehem. We think it irrelevant, however, to the issue of Bethlehem's duty to warn, which, as will be seen, turns on Alexander's knowledge. There is no dispute that the evidence showed that Alexander deemed the repairs to have been done improperly.

he had requested. He became upset and spoke with Johnson about the need to close the hole and correct the mistake. He then had Bethlehem "drill some holes so we could bolt a plug into it." Alexander further stated that he was present when Bethlehem drilled the "bolt circle," that the work conformed to his request, and that the rod and cylinder then were returned to Aero.

At Aero, a cap to fit in the bolt circle was made and bolted to the rod, all under Alexander's supervision. Slate saw the cap while it was being made and he knew of its intended purpose. He was also aware of the fact that Bethlehem had drilled the hole improperly in the first instance (at least in Alexander's view) thereby requiring these additional corrective measures. However, although Slate knew of the problem and Alexander's proposed solution, Slate relied entirely upon Alexander's skill and judgment in the matter.

After the cap had been attached to the rod, Alexander asked Slate, on October 26, 1978, to assist with a second test of the isostatic press. The rod was placed in the cylinder and pressure was brought up to 60,000 to 65,000 pounds per square inch and maintained at that level for about three to four minutes, when Slate noticed water dripping at the seam where the cap met the rod. As he called out to Alexander, a fine stream of water erupted from the seam, slicing Slate's face and right arm and hand.

Subsequent inspection of the isostatic press revealed that the leak had been caused by the failure of the seal on the end of the plug attached to the cap.

2. *Bethlehem's Appeal.*

a. *The duty to warn.* By way of motions for a directed verdict, a judgment notwithstanding the verdict, and a new trial (see Mass.R.Civ.P. 50[a] and [b], and 59[a], 365 Mass. 814-815, 827 [1974]), Bethlehem has preserved for appeal the question whether there was sufficient evidence to warrant a jury in finding that Bethlehem had failed to warn of the dangerous character of the machine.[5]

---

[5] Although Bethlehem requested jury instructions on the law of a duty to warn, it did so specifically without waiving its right to argue subsequently,

Taking the evidence most favorable to John and Catherine Slate, we think it insufficient to demonstrate a duty to warn on the part of Bethlehem. Whether such a duty exists " 'depends on [the supplier's] superior knowledge and is said to exist when one may reasonably foresee danger of injury or damage *to one less knowledgeable* unless adequate warning of danger is given.' [Citations omitted.] Furnishing instructions designed to make the product's use more efficient will not necessarily discharge the duty to warn; [the supplier] still must call attention to the dangers to be avoided." *Fiorentino* v. *A.E. Staley Mfg. Co.,* 11 Mass. App. Ct. 428, 433-434 (1981). (Emphasis supplied.) See also *Wolfe* v. *Ford Motor Co.,* 6 Mass. App. Ct. 346, 349-350 (1978) ("The duty of the [supplier] to warn of the dangers in the use of [the] product is well established; it is applicable to hazards involved in the use of properly designed products by users to whom the danger would not be apparent. [Citations omitted.] 'If the manufacturer owes a duty to use due care in making his products, he owes also the companion duty to warn of the latent limitations of even a perfectly made article, the use of which, however, is dangerous *if the user is ignorant* of those limitations and the manufacturer has no reason to believe that he will recognize the danger.' *Tomao* v. *A.P. DeSanno & Son,* 209 F.2d 544, 546 [3d Cir. 1954]" [emphasis supplied]).

There is no evidence to show that Bethlehem knew of a danger which Alexander did not know of, or that Bethlehem knew of a danger and had reason to believe that Alexander did not appreciate it.[6] If one were to accept Johnson's testimony and reject Alexander's, the conclusion would be that Alexander had superior knowledge. If, however, Alexander's testimony were taken over Johnson's then the credible evidence would

should there be a need to do so, that there was insufficient evidence to show that a duty existed.

[6] Restatement (Second) of Torts § 388 comment k (1965) imposes a duty to warn upon a supplier (which includes repairmen, see comment c) of a chattel "of its dangerous character in so far as it is known to him, or of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved."

show, at most, that Alexander had equal (if not superior) knowledge. But on no state of the evidence would the jury be warranted in finding that Bethlehem had knowledge superior to that of Alexander. Cf. *Corsetti* v. *Stone Co.,* 396 Mass. 1, 24-25 (1985).

Although Bethlehem had no duty to warn Alexander of the dangerous character of the press, it could nonetheless be liable to John Slate (and, hence, Catherine) if its reliance upon Alexander to impart his knowledge of any danger to Slate was unjustified or unreasonable. There is, however, no evidence of those types of circumstances which would warrant a jury to make such a finding. See *MacDonald* v. *Ortho Pharmaceutical Corp.,* 394 Mass. 131, 135-136 (1985), citing Restatement (Second) of Torts § 388 comment n (as next more fully discussed), and § 452 comment f (1965).

b. *Evidence of trade custom or standards of practice.* In concluding that the evidence was insufficient to warrant a finding that Bethlehem was negligent in relying upon Alexander to warn or to correct the dangerous character of the press, we have not ignored the testimony of one Bradford Schofield. Bethlehem, in its brief before us, concedes Schofield's expertise in the fields of mechanical engineering and the design and operation of pressure vessels. Schofield's opinion that Bethlehem was negligent in relying upon Alexander, however, was admitted in evidence over Bethlehem's objection lodged on the basis of a lack of expertise in the area of custom and practices within the machine shop industry in doing repair work.

Although Schofield's expertise in the area of custom and practice in the machine shop repair industry could be viewed as thin, we assume without deciding that the trial judge did not abuse his discretion in admitting Schofield's opinion. See *Lovasco* v. *Pinehurst Marine Ry.,* 322 Mass. 64, 67 (1947), and cases collected in *Cronin* v. *McCarthy, ante* 448, 451 n.1 (1986).

Schofield was asked whether Bethlehem's conduct "comports with the standard of conduct with which you are familiar, applicable to machine shops that injure a part or a piece upon

which they are working?" Schofield's response that "[c]ertainly it does not" was based upon three reasons, which we recite in full:

> 1. "Well, first of all, they did a part job. They drilled and tapped the holes to provide a cap for a seal. They are aware of the fact that a seal was to be put in. That alone — all by itself — does not tell them that the solution to the problem of the mistake that they made is going to be proper and do the proper sealing for the pressure vessel."
>
> 2. "Furthermore, they received a vessel in a condition where the seals had bound up the core of the part due to a defect in the seal design in the first place."
>
> 3. "And it seems to me that to rely on that same person to provide another seal on the vessel — one already having been misdesigned — would not satisfy me, and I don't think would satisfy customs and standards of the industry that a repair would be made properly."

There is documentary evidence, the invoice slip, which shows that Bethlehem received the press from, and was to do repair work for, Aero. Johnson's testimony, if believed, reveals that while employed at Bethlehem he had done work on equipment owned by Aero on at least two or three prior occasions and that he knew Alexander prior to the present instance.

Even assuming that the jury did not accept Johnson's statements as to his previous dealings with Aero and Alexander, there is nothing in the evidence to show that Bethlehem had any reason to assume that Aero or Alexander would not act appropriately to protect those Aero employees expected to use the machine. See Restatement (Second) of Torts, *supra* at § 388 comment n.[7] Cf. *MacDonald* v. *Ortho Pharmaceutical*

---

[7] Comment n reads, in pertinent part: "[W]hile it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it unless he knows that the other is careless, it may be improper to permit him to trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of

*Corp.*, 394 Mass. at 138-139. Schofield's opinion that the press had been "misdesigned" from the outset does not constitute such evidence.

Viewing the evidence in its entirety in the light most favorable to the plaintiffs, *Uloth* v. *City Tank Corp.*, 376 Mass. 874, 876 (1978), we conclude that even when Schofield's testimony is considered, the evidence is insufficient to warrant a jury in finding that Bethlehem should have warned Aero's employees directly about the dangerous character of the machine. As a result, Bethlehem is entitled to the new trial that it seeks.[8]

3. *Aero's Appeal.*

a. *Vicarious liability.* Taking the same procedural steps as Bethlehem (see part 2a and note 5, *supra*), Aero has preserved for review the issue of the sufficiency of the evidence to allow the jury to consider whether Alexander was an independent contractor, or engaged in a joint enterprise with Aero, or an Aero employee. Again, we consider the evidence in a light most favorable to the plaintiffs to determine whether the jury reasonably could find Aero vicariously liable for any negligence on the part of Alexander.

In view of Fonzo's testimony concerning the business relationship between Aero and Alexander, the manner by which Alexander was compensated, the facts that he had an office on Aero's premises, that he could and did use Aero employees in his work for Aero, and that he would neither accept work from Aero's competitors nor engage in any business that would conflict with the interests of Aero, we think the evidence sufficient to warrant a jury to find that Aero could be held liable for any negligence by Alexander in his work with Aero. See

---

whose character he knows nothing. It may well be that he should take the risk that this information may not be communicated, unless he exercises reasonable care to ascertain the character of the third person, or unless from previous experience with him or from the excellence of his reputation the supplier has positive reason to believe that he is careful."

[8] Any new trial would presumably be predicated on a theory of negligent repairs by Bethlehem. Bethlehem has made no argument in its brief that it may not be held liable in damages to the Slates because of its repair work, and we intimate no view on this theory.

generally *Stock* v. *Fife,* 13 Mass. App. Ct. 75 (1982), and authorities therein collected and discussed.

b. *Testimony of previously unidentified experts.* Aero contends that it was unfairly surprised and prejudiced by evidence from three experts about whom it had been given no notice.

i. *Dr. David Swenson.* Well in advance of trial, Aero was given notice that Catherine Slate was consulting with Dr. David Swenson (Swenson), and it was provided with a written report from Swenson. This report was updated in 1984, but a copy was not then given to Aero, nor was Aero given notice that Swenson would testify at trial. It was not until after the jury had been empanelled that Aero was advised that Swenson would testify, and Swenson's updated report was provided the day before Swenson's testimony was received. Aero argues that this sequence of events deprived it of the opportunity to prepare adequately for cross-examination of this witness. The argument is unfair to the trial judge.

Although sympathetic to Aero's position in this matter, the trial judge explained that he wanted the case "tried or disposed of on the merits for the part[ies], not on conduct or lack of activity by counsel," but he also wanted counsel to Aero to have the "full opportunity to prepare" for cross-examination. He was, therefore, willing to rearrange the order of testimony to give counsel whatever reasonable time was needed. Counsel replied that he "just need[ed] thirty minutes." We see no abuse of discretion in the trial judge's refusal to exclude Swenson's testimony.

ii. *Dr. Arthur DiMattia.* Because Dr. Arthur DiMattia testified as to John Slate's inability to work as a result of his injuries, and because the inability to work had to affect one's self-image which would be relevant to consortium, Aero argues that it should have been allowed to cross-examine DiMattia.

Contrary to the requirements of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), Aero makes no reference to where in the record it can be seen that counsel requested but was denied the opportunity to cross-examine DiMattia. Moreover, our review of DiMattia's testimony shows that the trial judge instructed the jury at the conclusion of DiMattia's

testimony that all evidence received from him was "allowed in solely against Bethlehem Steel and not as to Aero Manufacturing."

iii. *Bradford Schofield.* Aero argues that, because it did not receive notice from the plaintiffs that Schofield would testify at trial that the seal used by Aero was improper, it had no reason to consult an independent expert knowledgeable in the area of elastomeric seal materials, and hence, Schofield's testimony should have been excluded.

We agree with the trial judge's reasoning that Aero was not prejudiced by any lack of notice as to what Schofield's testimony would be. Aero had notice through Bethlehem's answers to interrogatories that evidence would be presented by its expert on this identical claim, use of an improper seal by Aero. If Aero was prepared to meet Bethlehem's expert, it also would be ready to cross-examine Schofield. Aero points to no incident which rebuts the trial judge's reasonable inference.

4. *Conclusion.*

It follows from what we have said that the judgments against Bethlehem are reversed. As damages have been established, the matters are remanded to the Superior Court for a new trial on the sole issue of Bethlehem's liability, if any, for negligent repairs. The judgment as to Aero is affirmed.

*So ordered.*