# United States Court of Appeals
## For the First Circuit

No. 10-2239

BARRY NOLAN,

Plaintiff, Appellant,

v.

CN8, THE COMCAST NETWORK, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Selya, and Lipez,
Circuit Judges.

Lawrence P. Murray, with whom Laura R. Studen, Joshua N. Cook, and Burns & Levinson LLP were on brief, for appellant.
Joshua M. Davis, with whom Evan J. Shenkman, Asha A. Santos, and Ogletree, Deakins, Nash, Smoak & Stewart, P.C. were on brief, for appellees.

August 29, 2011

**LIPEZ**, **Circuit Judge**. Barry Nolan, a regional television personality, was discharged from his employment with The Comcast Network, LLC ("Comcast") after he publicly protested the selection of political commentator Bill O'Reilly for a prestigious broadcasting award. In response to this discharge, Nolan filed in the Massachusetts Superior Court a claim of speech-motivated retaliation under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws Ann. ch. 12, §§ 11H, 11I. After Comcast's removal of the case to federal court, the district court entered summary judgment in favor of Comcast on Nolan's suit, finding no violation of the MCRA. We affirm.

## I.

On appeal from the grant of summary judgment, we recite the facts of record in the light most favorable to the non-moving party. E.g., Faiola v. APCO Graphics, Inc., 629 F.3d 43, 45 (1st Cir. 2010).

In 2008, Nolan was employed by Comcast as the executive producer and on-air host of the television program "Backstage with Barry Nolan." The program aired on CN8, Comcast's northeast regional cable television network, and primarily featured celebrity interviews and local entertainment news. A written agreement set forth the terms of Nolan's employment with Comcast. By its terms, the employment was to run for two consecutive twelve-month periods, from May 2007 to May 2009.

Two paragraphs of the concise, ten-page document addressed the possibility of Nolan's premature discharge. Paragraph 6 set out several conditions under which Comcast was permitted to terminate the agreement without consequence. Among them were the following:

b. <u>Termination by Company</u>

I. The Company determines in its sole and absolute discretion that Employee should be removed from the position Employee is presently employed under this agreement;

. . .

v. Employee engages in any other act or omission warranting termination of employment in accordance with Company policy, including anything which, in the Company's sole and absolute judgment, brings Employee or the Company into public disrepute, contempt, ridicule, or scandal, or which, in the Company's sole and absolute judgment is offensive to a substantial segment of the viewing public or would reflect unfavorably on the Company's interests or reputation.

Paragraph 7 of the contract, meanwhile, established Comcast's obligations to Nolan should it elect to discharge him "for any reason other than the reasons set forth in Paragraph's [sic] 6(a) and 6(b) above."

In April, Nolan learned that the New England chapter of the National Academy of Television Arts and Sciences (NATAS) intended to honor the high-profile Fox News commentator Bill O'Reilly with the prestigious Governor's Award. The award would be presented at NATAS's annual Emmy Awards ceremony in Boston. Nolan,

himself a New England NATAS member and 2008 Emmy Award nominee, did not believe O'Reilly was a worthy choice for the award. On April 4, he sent a lengthy e-mail to other NATAS members in which he sharply criticized the selection of O'Reilly. He described the choice as, among other things, "an appalling and deeply offensive lapse in judgment," one which he feared "would legitimize the buffoonish excuse for journalism that Mr. O'Reilly presents on a nightly basis." Nolan sent this missive from his Comcast-affiliated e-mail address and included his Comcast-issued work phone number at the end of the message.

On April 8, Nolan's direct supervisor and CN8's Senior Director of Programming, Eileen Dolente, warned Nolan that he should "be selective about what [he] send[s] on the company address." She also reminded him that Comcast needed to maintain a business relationship with NATAS because CN8 held the exclusive television broadcast rights for the Emmy Awards ceremony. Nolan acknowledged the warning and agreed to send future e-mails from his personal e-mail address.

Nolan continued to voice his displeasure with O'Reilly's selection for the Governor's Award, however. The day after the warning from Dolente, he was contacted by a reporter for the Boston Herald to provide his comments on the subject. Upon learning of Nolan's contact with the media, Jon Gorchow, CN8's Vice President and General Manager, sent Nolan a sternly worded e-mail detailing CN8's "official position" on the protest. Among other things,

-4-

Nolan was informed that CN8 had already drafted a press release that it would issue, if necessary, to distance the network from his personal comments.  He was also instructed not to attempt to solicit support for his "campaign" from other CN8 employees, and was encouraged to speak to CN8's public relations department before speaking to the press any further.  The e-mail ended, "[B]y nature of your being a public figure, and a cn8 employee, you have certain obligations to the network that you must take into account here."

Less than an hour after receiving Gorchow's e-mail, Nolan contacted the reporter from the Boston Herald to provide additional material about O'Reilly.  On April 11, that newspaper published an article entitled "Barry Nolan pleads: Give Bill the boot!"  In it, Nolan was identified as "CN8's Barry Nolan" and was twice quoted describing O'Reilly as a "mental case."  That same day, Nolan sent an e-mail from his personal e-mail address to other 2008 Emmy Award nominees in which he urged them to join his "petition of protest" lest their awards be "forever tarnished" by O'Reilly's receipt of the Governor's Award.

Following the Boston Herald story, Nolan's protest was heavily criticized in the online blog "Tabloid Baby."  Over the next few days, Nolan repeatedly defended his actions and attacked his online critics; he submitted a rejoinder to the initial article in "Tabloid Baby" in which he insinuated that the author had a drinking problem, and he derided critical commenters as "O'Reilly

Fanboys." He even dared one (who, though anonymous, purported to be an attorney) to "Sue me you dipstick."

Just days before the Emmy Awards ceremony, Dolente flew from Philadelphia to Boston for a face-to-face meeting with Nolan. The purpose of the meeting was for Dolente to relay her instructions about Nolan's behavior at the upcoming Emmy ceremony. According to Nolan, Dolente's message was, "Be careful. Watch what you do. Don't make a scene. This is serious." She also clearly implied that Nolan's continued protest could result in adverse economic consequences for him.

Nolan arrived at the awards ceremony on May 10 with approximately one hundred copies of a homemade pamphlet. The pamphlet, six pages in length, detailed numerous examples of why Nolan believed O'Reilly to be a poor choice for the Governor's Award, including rather explicit details that had emerged from a sexual harassment lawsuit against O'Reilly. Nolan left copies of his pamphlet in various public areas outside the ballroom in which the ceremony was to be held, and on the dining tables inside the ballroom, one of which had been purchased by Comcast for Nolan and the "Backstage" team to attend.

At the ceremony, Nolan was approached by NATAS president Tim Eagan, who expressed his disapproval of Nolan's protest. In addition, Nolan was confronted at his dining table by hotel security, who informed him that he had to stop distributing the pamphlets. When O'Reilly was formally announced as the recipient

of the Governor's Award during the ceremony, Nolan stood up and left the room. He did not return to see his staff win Emmy Awards. The Senior Producer for Nolan's show said that his conduct "put a bit of a damper on the night for the staff." She also stated that she was approached that night by a Comcast executive who conveyed his displeasure with Nolan's protest.

That evening, Gorchow called Mike Doyle, the President of Comcast's Eastern Division, to apprise him of Nolan's actions. Later, Gorchow typed up a chronology of events and the merits of suspending Nolan as an alternative to terminating him. Among other things, Gorchow wrote:

> Barry put his own personal point of view ahead of the needs of the network, and did so at an industry function where he was a representative of the network, and presumably where his attendance was paid for by the network, and the result very well could have been extremely embarrassing for the network.

On May 12, Nolan received a memorandum suspending him for "insubordination and breach of contract." The memorandum quoted Paragraph 6(b)(v) of the employment agreement and included claims that Nolan had been "observed in a heated exchange" with Eagan on the night of the awards ceremony and that "[a]fter the event there was much discussion among the attendees of what had occurred and the spectacle [he] created." Nolan was ordered to refrain from any further communication with the media until his suspension was lifted. The next day, Dolante sent an e-mail to Nolan explaining, "[I]t's not the disagreement with the award decision that led to

-7-

the suspension, but rather the actions you took, which directly contradict the language in your contract. That's the bottom line here . . . ."

The same day Nolan received his suspension notice, Brian Roberts, Chairman and CEO of Fox News, received a letter from O'Reilly which read as follows:

> We at <u>The O'Reilly Factor</u> have always considered Comcast to be an excellent business partner and I believe the same holds true for the entire Fox News Channel. Therefore, it was puzzling to see a Comcast employee, Barry Nolan, use Comcast corporate assets to attack me and FNC.
>
> This outrageous behavior continued at The New England Emmy Award ceremony on May 10 and, again, Mr. Nolan was in attendance in conjunction with Comcast. If you need specifics, we would be glad to provide them.
>
> All of us here hope the situation will subside and that is why I am bringing it to your attention. The kind of attack launched by Nolan is uncalled for and unnecessary.
>
> Sorry to bother you with this, but it is a disturbing situation.

O'Reilly's letter eventually made its way to Comcast executives, including Doyle. In an e-mail discussing how Comcast ought to respond, Doyle stated, "I am very uncomfortable calling Bill O'Reilly and writing him because I do not trust Barry Nolan and have witnessed his total disregard for management decisions and his selfish actions over the reputation of cn8." He described Nolan as "a tough individual to defend to the folks at Fox News and the executives at Comcast." In a related e-mail, Doyle also made clear

that Nolan's suspension was provisional. According to Doyle, the "[b]ottom line is if he shows the right attitude toward handling this situation he gets another chance. If he doesn't, the show will continue with a new host."

On the very day that Doyle contacted O'Reilly to apologize for Nolan's conduct at the Emmy Awards ceremony, a letter from Nolan further disparaging O'Reilly appeared on the website "tvspy.com." Comcast executives were unable to determine the precise date that the letter had been submitted. Nolan testified in his deposition that he sent the letter sometime in May, "around the time all this was going on."

During his suspension, Nolan informed Dolente that he had been approached by the television show "EXTRA," which was looking for a local reporter and crew to cover Senator Ted Kennedy's hospitalization in Boston. Nolan recommended that Comcast lend some of its crew. "EXTRA" had also requested that Nolan provide an on-camera performance the following week, and asked Dolente for instructions about how he should respond. On May 17, Dolente informed Nolan that she agreed that he should "assist as he suggested." On May 18, however, she wrote Nolan and informed him that she was waiting to hear from someone in Comcast's Human Resources department regarding Nolan's request to do on-camera work during his suspension. On the morning of May 19, Dolente e-mailed Nolan stating, "The preference is that you pass on this request until you are back on the air at CN8 next week."

According to Nolan, he had already agreed to "EXTRA"'s request by the time he received Dolente's last e-mail, and he lacked sufficient time to find a replacement. He also took Dolente to have "expressed a preference - but not a demand." Thus, on May 19, Nolan appeared on air for "EXTRA." When Dolente inquired into whether he had appeared on "EXTRA" after she had instructed him not to, Nolan explained the situation. He then stated, "If they are still looking for a reason to fire me - I have no doubt they can find plenty here." Nolan followed that acknowledgment with a lengthy critique of Comcast's actions, including his suspension. He stated that he felt "violated" by the process, and he characterized Comcast's response to his protest as "punishing me and humiliating me because I felt morally obligated to oppose an action that brought discredit to an organization I was obligated to belong to - and discredit to our industry."

The next day, Gorchow sent an e-mail to Doyle, which read in relevant part as follows.

> Eileen received an e-mail rant from Barry expressing no guilt, no remorse, in fact quite the opposite. It is clear that despite his written acknowledgment, he is not willing to accept or even try to understand the facts surrounding his suspension, which he mistakenly continues to believe is about free speech rather than violating his contract and completely ignoring instructions from his supervisor.

That day, Gorchow made the decision to terminate Nolan. Nolan was notified by phone and also given a notice of termination, which

-10-

explicitly stated that the termination was "with cause, pursuant to Paragraph 6(b)" of his employment agreement.

## II.

Nolan filed a one-count civil complaint in Massachusetts Superior Court pursuant to the MCRA, alleging that Comcast, Dolente, and Gorchow interfered with his right to free speech as secured by the First Amendment to the United States Constitution and Article XVI of the Massachusetts Declaration of Rights. The defendants removed the case to federal district court, and, in due course, moved for summary judgment. Nolan opposed summary judgment and moved to strike portions of the affidavits and exhibits relied upon by the defendants.

The district court granted summary judgment for the defendants and denied the motion to strike. Nolan v. CN8, No. 1:08-cv-12154, 2010 WL 3749466, at *5 (D. Mass. Sept. 21, 2010). According to the court, the dispositive question under Massachusetts law was "whether Comcast had cause under the Employment Agreement to terminate [the plaintiff] or, alternatively, whether plaintiff was, in reality, an employee at-will." Id. at *3. If either condition obtained, the court reasoned, then Nolan's termination could not "interfere" with his right to free speech. Id. The district court correctly found that Nolan's employment was not "at-will in the traditional sense of that term" -- that is, employment terminable without notice or

-11-

reason by either party to the agreement. Id. at *4. Nevertheless, it concluded that the defendants' motion for summary judgment should be granted since Paragraph 6(b)(I) of the contract permitted Comcast to "terminate Nolan for any reason, or no reason at all, and since, in its sole discretion, it had cause to terminate his employment." Id.

The case is before us on Nolan's timely appeal of that ruling.

## III.

We review the district court's summary judgment ruling de novo. Summary judgment is appropriate whenever the record, viewed in the light most favorable to the non-movant, reveals "no genuine dispute as to any material fact" and shows that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010). A dispute is "genuine" only if a reasonable factfinder could resolve it in favor of either party. E.g., Borges, 605 F.3d at 4. A disputed fact is "material" only if its existence vel non has the potential to change the outcome of the suit. E.g., id. at 5. "Withal, we are not married to the trial court's rationale but may uphold its ruling on any ground made manifest by the record." Foote v. Town of Bedford, 642 F.3d 80, 82 (1st Cir. 2011).

Sitting pursuant to our diversity jurisdiction, we are constrained to apply the substantive law of Massachusetts. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). "In doing so, we 'look to the pronouncements of a state's highest court in order to discern the contours of that state's law.'" Barton v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011) (quoting González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 318 (1st Cir. 2009)). Where the highest court has not spoken directly on the question at issue, we must predict, as best we can, that court's likely answer. Id. Notably, our obligation to make such an "informed prophecy" is dampened by a concomitant duty to confine our forecast "within the narrowest bounds sufficient to permit disposition of the actual case in controversy." Moores v. Greenberg, 834 F.2d 1105, 1112 (1st Cir. 1987). Our task is thus limited, to the extent possible, to applying state law as it currently exists, not creating new rules or significantly expanding existing ones. In re Citigroup, Inc., 535 F.3d 45, 52 (1st Cir. 2008).

Here, the governing law is the Massachusetts Civil Rights Act, a state-law analogue to 42 U.S.C. § 1983 that provides a statutory civil cause of action against those who "interfere" with the exercise or enjoyment of rights secured by federal or state law. Mass. Gen. Laws Ann. ch. 12, § 11H. The MCRA differs from § 1983 in two significant respects. First, the MCRA is broader than § 1983 in that it reaches private conduct. It provides for civil claims against "any person or persons, whether or not acting

-13-

under color of law."  Id.; see also Batchelder v. Allied Stores Corp., 473 N.E.2d 1128, 1131 (Mass. 1985) (explaining that the "Legislature intended to provide a remedy . . . co-extensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not").

Second, the MCRA is narrower than § 1983 in that it limits its remedy to conduct that interferes with a secured right "by threats, intimidation or coercion."  Mass. Gen. Laws Ann. ch. 12, § 11H; see also Sena v. Commonwealth, 629 N.E.2d 986, 993 (Mass. 1994).  This latter requirement is of particular relevance here.[1]  The Massachusetts legislature intended that even a direct deprivation of a plaintiff's rights "would not be actionable under the act unless it were accomplished by means of one of these three

_____

[1] The concurrence suggests in its introduction that addressing the presence or absence of threats, intimidation, or coercion (1) "unnecessarily reaches an issue that was neither addressed by the district court nor substantively briefed by the appellees," and (2) "is out of step with the logical sequence prescribed by the Massachusetts Supreme Judicial Court."  The suggestion that the issue is not before us is just not so.  Although the district court did not reach the issue, there is no dispute that the appellant has argued that his termination was coercive.  We are not controlled in our analysis by the way in which the appellee chooses to respond.  Similarly, the concurrence is wrong to suggest that the Massachusetts courts have prescribed any particular order of addressing the elements of an MCRA claim.  The Supreme Judicial Court frequently disposes of such claims for lack of "threats, intimidation, or coercion" without deciding whether a plaintiff was exercising a secured right or whether that right was interfered with.  See, e.g., Buster v. George W. Moore, Inc., 783 N.E.2d 399, 403-12 (Mass. 2003); Brum v. Town of Dartmouth, 704 N.E.2d 1147, 1162 (Mass. 1999); Webster v. Motorola, Inc., 637 N.E.2d 203, 206 (Mass. 1994); Sena, 629 N.E.2d at 993; Layne v. Superintendent, 546 N.E.2d 166, 168 (Mass. 1989).

constraining elements."  Buster v. George W. Moore, Inc., 783

N.E.2d 399, 409 (Mass. 2003).

Although the Massachusetts Supreme Judicial Court has

explicitly endorsed the view that purely economic pressures may

constitute actionable coercion under the MCRA, see id. at 410 &

n.17, it has held that the termination, or threatened termination,

of at-will employees is not coercive in the relevant sense under

the MCRA.  See Webster v. Motorola, Inc., 637 N.E.2d 203, 206

(Mass. 1994); cf. Korb v. Raytheon Corp., 574 N.E.2d 370 (Mass.

1991) (finding "no improper interference with secured rights" where

at-will employee's speech made him ineffective advocate for

company).  Accordingly, in light of the district court's conclusion

that Paragraph 6(b)(I) of the employment agreement permitted

Comcast to "terminate Nolan for any reason, or no reason at all,"

the parties have devoted considerable attention to the issue of

whether Nolan was an at-will employee, either in fact or

constructively.  In particular, Nolan contends that these at-will

employment precedents are inapplicable to his claim because he was

a contract employee for a definite term who was terminated for

cause pursuant to Paragraph 6(b)(v).[2]

---

    [2] More fundamentally, Nolan contends that the district court
erred by looking to Paragraph 6(b)(i) of the agreement at all,
since Comcast terminated him pursuant to Paragraph 6(b)(v).  This
focus on Paragraph 6(b)(v) does not help Nolan's position.  See
infra.

We need not resolve the question of whether Nolan was an at-will employee, however.  Although a finding that Nolan was in fact an at-will employee would be outcome-determinative (in that his MCRA claim would fail for lack of coercion), a contrary finding would not be.  Nolan's right to relief turns on whether Comcast's termination of his employment constitutes "coercion" under the MCRA, and the Supreme Judicial Court's cases demonstrate only that some contractual entitlement to one's position is necessary, but not necessarily sufficient, to show that an employee's termination is coercive in the relevant sense.

The rationale behind the court's refusal to find actionable coercion in the termination of at-will employment remains somewhat unclear.[3]  For instance, the analysis in <u>Webster</u> v. <u>Motorola, Inc.</u>, among the more fully stated on the point, is (in full) that "because the plaintiffs were employed 'at will,' they had no contract right to their positions."  637 N.E.2d at 206.  Similarly, the Supreme Judicial Court has held that an employer's refusal to renew an employee's expired year-to-year contract in retaliation for the employee's attempt to form a union was not coercive under the MCRA because the employer merely "exercised its

_____

[3] Although the concurrence criticizes our reliance on case law whose reasoning is admittedly unclear, it fails to acknowledge that the approach it advocates rests on the same handful of precedents and fundamentally the same reasoning.  The Massachusetts courts have alternately described the lack of a contractual entitlement to continued employment as demonstrating an absence of coercion and an absence of interference with secured rights.

-16-

discretion under the terms of employment it chose to offer its teachers." Willitts v. Roman Catholic Archbishop, 581 N.E.2d 475, 479 (Mass. 1991). Viewing these cases, one federal court has suggested that the Supreme Judicial Court's approach reflects its judgment that the threatened deprivation of something to which one has no entitlement is never coercive. See Delmonte v. Laidlaw Envt'l Servs., Inc., 46 F. Supp. 2d. 89, 93 (D. Mass. 1999) ("[C]onditioning at-will employment on a restriction of the exercise of a secured right is not an MCRA 'threat, intimidation or coercion' because, in essence, at-will employees are not entitled to their employment, and therefore do not, when threatened with its loss, reasonably suffer coercion or intimidation.").

Outside of the context of at-will employees, the Supreme Judicial Court has never directly addressed the issue of whether, and under what circumstances, the termination of employment can be coercive. The dearth of case law in this area reflects what we have noted previously: "the exception for claims based on non-physical coercion remains a narrow one." Meuser v. Fed. Express Corp., 564 F.3d 507, 519 (1st Cir. 2009) (quoting Meuser v. Fed. Express Corp., 524 F. Supp. 2d 142, 147 (D. Mass. 2007)) (internal quotation mark omitted). At most, the Supreme Judicial Court suggested in Redgrave v. Boston Symphony Orchestra, Inc., 502 N.E.2d 1375 (Mass. 1987), that an employer's breach of contract in response to public outrage about an employee's political opinions

-17-

might be sufficiently coercive to warrant relief under the MCRA.[4] See Bally v. Ne. Univ., 532 N.E.2d 49, 52 (Mass. 1989) ("[I]n Redgrave, . . . we stated that the Boston Symphony Orchestra violated the Act because its cancellation of its contract with Redgrave had the effect, intended or otherwise, desired or not, of coercing Redgrave not to exercise her First Amendment rights."). But this is not a case in which Comcast breached its contract, depriving Nolan of future economic gain to which he was rightfully entitled. Cf. Acciavatti v. Prof'l Servs. Grp., Inc., 982 F. Supp. 69, 78-79 & n.7 (D. Mass. 1997) (situating the termination of employee covered by collective bargaining agreement within Massachusetts's economic coercion case law).

Here, Paragraph 6(b)(v) of the employment agreement afforded Comcast unlimited discretion to terminate Nolan for his campaign of public protest, regardless of whether the agreement was otherwise terminable at will.[5] There can be no genuine dispute

_____

[4] As the Supreme Judicial Court has acknowledged, the Redgrave Court "merely answered two certified questions, neither of which addressed whether the actual or threatened infliction of economic harm could constitute 'coercion' within the meaning of the act." Buster, 783 N.E.2d at 410 n.17. Nevertheless, that decision "has generally been accepted as establishing a foundation for the proposition that actual or prospective 'breach of contract' constitutes 'coercion' under the act." Id.

[5] The contract is far from a model of clarity. For example, Paragraph 6(b)(i) ostensibly permits Comcast to fire Nolan for any reason at all. Yet Paragraph 7 establishes Comcast's continuing obligations to Nolan in the event that it prematurely terminates the contract "for any reason other than the reasons set forth" in Paragraph 6. For the reasons articulated herein, we need not grapple with such apparent inconsistencies.

that Comcast made the judgment that Nolan's behavior reflected negatively on Comcast and thus warranted his termination, and there has been no suggestion to the contrary.[6]

Nolan nevertheless contends that summary judgment is inappropriate because there remain "genuine issues of material fact as to whether [he] was insubordinate, whether he breached his employment agreement, and whether he publicly acted contrary to Comcast's business interest."  Pursuant to the employment agreement, the absolute right to make those determinations falls to Comcast, and hence the issues he identifies are not material.[7]

Given the Supreme Judicial Court's refusal to find actionable coercion in the termination of at-will employees under the MCRA, we cannot see a reasonable argument for distinguishing Comcast's exercise of its unlimited discretion in terminating

---

[6] In a footnote, Nolan observes that the implied covenant of good faith and fair dealing obligated Comcast to exercise its contractual discretion in good faith, rather than as pretext.  Even if this argument were not waived, see Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived."), the record reveals no pretext. Instead, it overwhelmingly demonstrates that Comcast's concerns about Nolan's speech and its consequences was, in fact, the basis for the termination of his employment.

[7] For this reason, the district court also correctly denied Nolan's motion to strike.  To the extent that the challenged affidavits and exhibits contain statements that would be inadmissible hearsay if offered for their truth, they are nonetheless admissible as evidence of Comcast's knowledge and state of mind at the time of the termination decision.  See generally Massachusetts Guide to Evidence § 801(c) & note at 246-247 (2010 ed.).

Nolan's employment under Paragraph 6(b)(v). Nolan's employment agreement, whether or not creating "at-will" employment under Massachusetts law, provided Comcast with discretion to terminate the agreement so close in substance to at-will employment that we cannot imagine the Supreme Judicial Court finding coercion in these circumstances. Because the record, viewed in the light most favorable to Nolan, thus fails to show actionable "threats, intimidation or coercion" by Comcast, Nolan's claim under the MCRA necessarily fails.

In reaching this outcome, we have carefully avoided making judgments about contracts that offer more protection to their employees than the one at issue here. The same cannot be said for the concurrence, which broadly proclaims, without citation, that "the exercise of a legitimate cause for termination under the terms of an employment contract . . . eliminates any possibility of the sort of interference . . . required by the MCRA." Infra p. 25. The concurrence extrapolates this principle from Massachusetts case law that has not yet confronted an MCRA claim brought by a terminated contractual employee. This approach disregards our obligation in diversity cases to resolve state law questions narrowly, and only as far as necessary to decide the case before us. The concurrence's approach would curtail the protections available to Massachusetts employees under a Massachusetts remedial statute without meaningful indication from either Massachusetts courts or the Massachusetts legislature that

-20-

such curtailment is appropriate.  Moreover, in every case involving the termination of employment, the question whether there was a breach of contract would become a necessary antecedent to the question whether an MCRA claim may lie, effectively requiring a trial within a trial.  To be sure, the circumstances of this case required us to look to the terms of Nolan's contract, but it is the analogy to at-will employment, and thus to the well-established principle that the termination of an at-will employee will not give rise to an actionable claim under the MCRA, that drives the outcome here.  Where that analogy no longer holds, nothing we have said here should be read to preclude the possibility of relief under the MCRA for a terminated contractual employee.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

So ordered.

**-Concurring Opinion Follows-**

**SELYA, Circuit Judge (concurring in the judgment).** I agree with my brethren that the entry of summary judgment in this case should be affirmed. I write separately, however, because the majority's analytical approach is out of step with the logical sequence prescribed by the Massachusetts Supreme Judicial Court (SJC), unnecessarily reaches an issue that was neither addressed by the district court nor substantively briefed by the appellees, and adds elements of confusion to what I view as a straightforward case.

As the SJC has repeatedly stated, a plaintiff who sues under the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, §§ 11H, 11I, must show: (I) that he was exercising a protected right; (ii) that the defendant interfered (or attempted to interfere) with that right; and (iii) that the interference was accomplished (or meant to be accomplished) by threats, intimidation, or coercion. Freeman v. Planning Bd. of W. Boylston, 646 N.E.2d 139, 148-49 (Mass. 1995); Bally v. Ne. Univ., 532 N.E.2d 49, 51-52 (Mass. 1989).[8] In this practical progression, the question of whether the case involves interference is antecedent to the question of how any interference may have been accomplished. See, e.g., Korb v. Raytheon Corp., 574 N.E.2d 370, 372-73 (Mass. 1991); cf. Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333,

_____

[8] The cases cited by the majority, see supra note 1, do not support a contention that Massachusetts has departed willy-nilly from this sequence.

-22-

337-38 (Mass. 1996) (recognizing need at least to assume interference before reaching question of coercion).

The majority inexplicably abandons this measured framework and jumps to the coercion question. It does so despite the lack of any treatment of that issue by the district court and only a passing reference to it by the prevailing parties, who correctly state that it is unnecessary to deal with the issue. Ultimately, what emerges is a confused and confusing analysis regarding the nature of coercion, in which the majority acknowledges that the SJC's application of that term is unclear, yet proceeds to rely on a patchwork of marginally relevant state and federal cases to reach a conclusion that adds little clarity to the issue. I would take a more direct approach — one that fits comfortably with the sequence established by Massachusetts precedent — and dispose of the plaintiff's claim at the interference step.

The plaintiff, in denouncing O'Reilly's nomination, was plainly exercising constitutionally guaranteed rights.[9] The logical question then is whether the defendants can be said to have interfered with the plaintiff's exercise of those rights.

---

[9] In <u>Redgrave</u> v. <u>Boston Symphony Orchestra, Inc.</u>, 855 F.2d 888 (1st Cir. 1988) (en banc), we noted that there is a certain awkwardness in applying the MCRA where free speech rights are involved. <u>Id.</u> at 904. My view of the interference prong in this case makes it unnecessary to probe the implications of this uneasy fit.

Of course, an adverse employment action may, in certain circumstances, constitute interference with the exercise of constitutional rights. See, e.g., Foote v. Town of Bedford, 642 F.3d 80, 83 (1st Cir. 2011); Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011); see also Poh v. Mass. Corr. Officers Federated Union, No. 1:03-cv-11987, 2006 WL 1877089, at *6 (D. Mass. July 7, 2006) (making this observation under MCRA). In an effort to bring his case within this sphere, the plaintiff tries to draw a line in the sand between at-will employees and persons employed under contracts. His thesis is that termination of a person within the former group cannot amount to interference while termination of a person within the latter group categorically amounts to interference. That thesis is incorrect.

It is true that an at-will employee normally will be unable to demonstrate the type of entitlement to continued employment sufficient to support an MCRA claim. See, e.g., Webster v. Motorola, Inc., 637 N.E.2d 203, 206 (Mass. 1994); Korb, 574 N.E.2d at 372. It does not follow, however, that the mere existence of an employment contract establishes that the firing of the contract-holder amounts to interference. The interference inquiry is functional, not formalistic. Termination of employment can only interfere with the exercise of protected rights to the extent that the plaintiff has an entitlement to ongoing employment. See Buster v. George W. Moore, Inc., 783 N.E.2d 399, 410 (Mass.

-24-

2003); <u>Korb</u>, 574 N.E.2d at 372 n.3; <u>see</u> <u>also</u> <u>Poh</u>, 2006 WL 1877089, at *6.

Different contracts have different permutations, and an individual who is employed under a particular contract may be unable to show interference if, say, the terms of the contract afford the employer a valid reason for terminating the contract. <u>See</u> <u>Willitts</u> v. <u>Roman Cat. Archbishop of Bos.</u>, 581 N.E.2d 475, 480 (Mass. 1991) (finding "no improper interference" where employer "exercised its discretion" in deciding not to renew an expiring employment contract). In other words, the exercise of a legitimate cause for termination under the terms of an employment contract eliminates any right to continued employment and, thus, eliminates any possibility of the sort of interference with that right required by the MCRA. It is hard to imagine a better illustration of this precept than a situation in which the contract confers upon the employer the sole discretion to terminate.[10]

The rest is child's play. Under Massachusetts law, courts are charged to interpret a contract "according to its plain

---

[10] The majority is concerned that the approach I take "mak[es] judgments about contracts that offer more protection to their employees than the one at issue here" and "disregards our obligation in diversity cases to resolve state law questions narrowly." <u>Supra</u>, pp. 20-21. To the contrary, my approach is appropriate here precisely because the contract in this case uniquely functions like an at-will contract, making the application of Massachusetts precedent in that area compelling. Because this approach applies state law by direct analogy, it is necessarily narrow — much more so than the majority's speculative attempt to unravel the meaning of coercion.

meaning." S. Union Co. v. Dep't of Pub. Utils., 941 N.E.2d 633, 640 (Mass. 2011). The interpretation of an unambiguous contract is a matter of law for the court. Seaco Ins. Co. v. Barbosa, 761 N.E.2d 946, 951 (Mass. 2002). So, too, is the determination as to whether a contract contains an ambiguity. Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008).

Gauging the existence of an ambiguity requires an objective reading of the text of the contract; "an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." Lumbermens Mut. Cas. Co. v. Offices Unltd., Inc., 645 N.E.2d 1165, 1168 (Mass. 1995). To be ambiguous, the language, fairly read, must be "susceptible of more than one meaning." Id.

The key provision of the Agreement is paragraph 6(b)(v). With respect to that paragraph, the plaintiff asserts that there remain "genuine issues of material fact as to whether [he] was insubordinate, whether he breached his employment agreement, and whether he publicly acted contrary to Comcast's business interests." Appellant's Br. at 18. This assertion fails because the factual disputes that the plaintiff identifies are not material. The plain language of paragraph 6(b)(v) designates Comcast as the sole arbiter of whether the plaintiff's actions reflected unfavorably on Comcast's interests or reputation (and, thus, warranted termination). The paragraph twice notes that Comcast's "sole and absolute judgment" controls decisions of this

-26-

type.  In light of that language, it is beyond peradventure that Comcast validly invoked its authority under paragraph 6(b)(v) when it cashiered the plaintiff.

For present purposes, the only relevant question is whether Comcast determined that the plaintiff's conduct violated paragraph 6(b)(v).  There is no room to doubt either that Comcast made such a determination or that it timely communicated this determination to the plaintiff.  Once Comcast ended the plaintiff's employment in conformity with this contractual provision, his right to continued employment was extinguished.

That effectively ends the matter.  The warrantable loss of the right to continued employment under the Agreement destroyed the necessary predicate for maintaining an action under the MCRA.  Simply put, there was no interference with any protected right.

There is nothing fundamentally unfair about this outcome.  The plaintiff, a highly compensated individual in a highly visible position, bargained for and accepted an arrangement that gave his employer unfettered discretion in such matters.  He knew from the start that Comcast's "sole and absolute judgment" would determine when and whether paragraph 6(b)(v) would apply.

The upshot is that, under the Agreement, Comcast was free to discharge the plaintiff if, in its sole judgment, his conduct impaired the company's interests.  Its exercise of that prerogative did not interfere with any right protected by the MCRA, and I would affirm the entry of summary judgment on this ground.

-27-