# United States Court of Appeals
## For the First Circuit

No. 18-1102

MARK THOMAS,

Plaintiff, Appellant,

v.

CORNELIUS J. HARRINGTON, a/k/a Neil Harrington;
TOWN OF SALISBURY; ROBERT ST. PIERRE,

Defendants, Appellees,

DANIEL MCNEIL; EUGENE SCIONE; RICHARD MERRILL; STEVEN
SFORZA; MICHAEL ADLER; THOMAS FOWLER; KEVIN SULLIVAN;
DAVID L'ESPERANCE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Lynch, Stahl, and Lipez,
Circuit Judges.

Cary P. Gianoulis, with whom John F. Tocci was on brief, for
appellant.
Adam Simms, with whom John J. Cloherty III was on brief, for
appellees.

November 28, 2018

**STAHL**, **Circuit Judge**.  This appeal arises out of an alleged conspiracy to terminate plaintiff-appellant Mark Thomas from his position as an officer at the Salisbury Police Department ("SPD").  In 2010, Cornelius Harrington, the Salisbury town manager, hired Robert St. Pierre to investigate allegations of misconduct by the then-police chief, David L'Esperance.  During the investigation, St. Pierre also uncovered evidence of alleged wrongdoing by Thomas, resulting in a follow-up investigation. Harrington terminated Thomas from his employment based on that second investigation, but an arbitrator later reversed that decision.  Nevertheless, Thomas retired soon after and alleged, inter alia, that Harrington and St. Pierre conspired against him. He further alleged that Harrington violated the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12 §§ 11H, 11I, by depriving him of a protected property right -- namely, his continued employment with the SPD.

Thomas has offered little evidence beyond bald speculation for the existence of a conspiracy.  Moreover, he has not shown that his constitutional rights were interfered with by "threats, intimidation, or coercion," as required by the MCRA. Accordingly, and for the following reasons, we affirm the district court's grant of summary judgment.

### I.   Factual Background

In April 2006, Harrington hired David L'Esperance as Salisbury's new police chief.  Soon after L'Esperance was hired, he promoted Thomas to detective and eventually designated him as Chief of Detectives,[1] decisions which Thomas allege created substantial jealousy among other SPD officers.

In autumn 2010, two SPD officers made allegations of misconduct against L'Esperance.  The allegations reached Harrington who, on advice of counsel, placed L'Esperance on administrative leave.  Harrington then reached out to St. Pierre, a retired former Chief of Police in Salem, Massachusetts, and set up a meeting to discuss the allegations.[2]  After this discussion, on December 9, 2010, St. Pierre entered into a "Professional Services Agreement" with Salisbury to investigate the allegations against L'Esperance.  Harrington did not obtain permission from the town's Board of Selectmen prior to soliciting St. Pierre's services, nor did the Board initially approve the contract.  However, Harrington was not required to first obtain the permission of the Board of Selectmen before hiring an outside consultant on

---

[1] It appears that L'Esperance's decision to designate Thomas as "Chief of Detectives" was informal.

[2] Harrington had been the mayor of Salem, Massachusetts for seven years, during which time St. Pierre was the Salem police chief.

behalf of the town, and no member of the Board voiced an objection to Harrington's decision to retain St. Pierre's services.

Before the investigation concluded, however, L'Esperance resigned from active duty with the SPD. Thereafter, on January 24, 2011, St. Pierre tendered his investigative report to Harrington, which concluded that L'Esperance had violated numerous SPD rules. As relevant here, the report also disclosed allegations of misconduct against Thomas. Among those allegations were that Thomas (1) studied for the bar exam while on the job; (2) observed but failed to report L'Esperance pilfering evidence at crime scenes; and (3) fabricated portions of his resume for submission to the FBI in connection with his application to attend a FBI training program.

The Board of Selectmen held a meeting on January 24, 2011, at which the Board asked Harrington to contact St. Pierre to further investigate "loose ends" from the L'Esperance report, including the allegations against Thomas. The Board confirmed that request during a February 24, 2011 public meeting. At the end of that meeting, Thomas requested that SPD internal affairs conduct the investigation into him instead, but this request was denied.

Pursuant to the Board of Selectmen's instruction, Harrington once again reached out to St. Pierre and asked that he conduct the investigation into Thomas. St. Pierre initially

replied that, because Thomas was not a "ranking officer," the SPD could conduct the investigation internally. However, St. Pierre eventually acceded to the request and entered into another Professional Services Agreement on February 28, 2011. The then-acting SPD chief, Kevin Sullivan, requested that Detective Steven Sforza be permitted to help with the investigation. On May 24, 2011, Sullivan's successor as acting SPD chief, Richard Merrill, placed Thomas on paid administrative leave during the pendency of the investigation.

During the investigation into Thomas, St. Pierre interviewed several municipal and SPD employees. One SPD officer, Daniel McNeil, testified that during his recorded interview, St. Pierre turned off the tape recorder and said something to the effect of "[this] is not where I'm going with this or what I'm looking for." McNeil understood this comment to mean that he was "being obviously directed" by St. Pierre to give negative information about Thomas.

Thomas separately contends that, during the L'Esperance investigation, Sforza illegally taped a conversation with him while at the SPD station in December 2010. This allegation came to light while Sforza was assisting with the Thomas investigation and, although Sforza denied the claim,[3] he was removed from the

---

[3] Sforza claimed that the tape recorder was "broken" during the incident in question.

Thomas investigation thereafter. Despite that removal, Thomas alleges that Sforza continued communicating with St. Pierre, a claim that appellees deny.

During their respective depositions, Harrington and St. Pierre testified that Harrington's role in the Thomas investigation was limited. For example, both testified that Harrington did not provide St. Pierre with questions to ask witnesses or tell St. Pierre or Sforza whom to interview. In addition, Harrington was never given a copy of St. Pierre's investigatory notes.[4] Appellees claim that Harrington also did not give St. Pierre advice on what "issues [St. Pierre] should investigate." Thomas disputes that claim, pointing to several communications between Harrington, St. Pierre, and town counsel relating to the investigation. Although those communications largely summarized the progress of St. Pierre's investigation, in one email concerning Thomas's prior disciplinary history, town counsel stated "[Thomas] may have just shot himself in the foot."

On August 1, 2011, St. Pierre delivered a draft copy of his investigative report to Harrington. Harrington made several changes to the report, and submitted it to the Board of Selectmen

---

[4] St. Pierre provided Harrington with the transcript of a SPD dispatcher, Kristine Harrison, to keep him "informed." Thomas also points out that St. Pierre destroyed his investigative notes from the L'Esperance and Thomas investigations. However, St. Pierre testified that he was trained to destroy investigative notes at the conclusion of an investigation.

on September 28, 2011.  That same day, Harrington sent a letter to Thomas notifying him that a disciplinary hearing would be held regarding the contents of the report.  In addition, in response to a Freedom of Information Act ("FOIA") request, Harrington forwarded a copy of the report to a reporter with the Newburyport Daily News, a local newspaper.[5]  The report was published the following day.  A copy was also anonymously forwarded to the Massachusetts Board of Bar Overseers, an action Thomas attributes to Harrington.[6]

The disciplinary hearing was held on December 15, 2011, during which no witnesses testified, and the town simply entered St. Pierre's report into the record.  Harrington issued a decision on February 8, 2012, upholding two of the four charges against Thomas and dismissing the other two.  Specifically, Harrington found that Thomas had (1) studied for the bar exam while on duty; and (2) falsified his resume in the application to the FBI.  He then terminated Thomas's employment with Salisbury.  However, on

---

[5] In his brief, Thomas disputes that the report was given to the Newburyport Daily News pursuant to a FOIA request.  However, Harrington and St. Pierre explicitly referred to the FOIA request in an e-mail exchange, and Thomas offers no evidence to rebut that claim.

[6] To that end, in an email dated September 21, 2011, Harrington stated "I am assuming that we will also be giving a copy of the [Thomas] report to the Board of Bar Overseers."  In his deposition, Harrington testified that he could not recall whether he had provided the Thomas report to the Board of Bar Overseers.

October 31, 2012, an arbitrator reversed the decision, finding that there was insufficient evidence to support Thomas's termination. The SPD reinstated Thomas in December 2012 and, in accordance with the arbitrator's order, provided him with full back pay.

Thomas testified that soon after his reinstatement, the new permanent police chief, Thomas Fowler, told him that many SPD officers "did not want him back." In addition, Fowler placed certain conditions on Thomas's ability to moonlight as a practicing attorney, expressing the need to avoid conflicts of interest. Specifically, Fowler required that Thomas refrain from practicing criminal defense and labor and employment law. He also required Thomas to decline any cases involving either the SPD or Salisbury. Emails from that time show that Fowler notified Harrington that he was limiting Thomas's law practice, though the parties dispute whether Harrington played an active role in Fowler's decision-making.

On March 24, 2014, Thomas sent Fowler a letter stating, "I am in fear for my life at work and truly believe that many of the officers and town employees will retaliate with grave circumstances[.]" As a result of this letter, Fowler placed Thomas on paid administrative leave. Approximately two weeks later, Fowler received a letter from Thomas's psychologist stating that Thomas was being treated for certain medical conditions and

recommending that Thomas "take a leave of absence until further notice." Fowler then converted Thomas's administrative leave to long-term sick leave. Thomas never returned to active duty, and eventually retired from the SPD on November 23, 2015.

## II. Procedural Background

On September 29, 2014, Thomas filed this suit in the District of Massachusetts against Harrington, St. Pierre, Salisbury, and eight other current and former SPD officers. His complaint included 12 counts, including claims under the United States and Massachusetts Constitutions, Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H, 11I, Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185, and state common law. On separate motions to dismiss, the district court dismissed claims against all defendants except for Harrington, St. Pierre, and Salisbury. As relevant here, the district court allowed the following claims to proceed to discovery: retaliation in violation of the First Amendment by Harrington and Salisbury (Count 1), civil conspiracy by Harrington and St. Pierre (Count 5), and interference with Thomas's continued right to employment in violation of the MCRA by Harrington (Count 7). In two separate decisions,[7] the district court granted defendants' motion for

---

[7] In its memorandum and order dated September 30, 2017, the district court granted summary judgment as to the sole remaining federal claim. See Thomas v. Town of Salisbury, 277 F. Supp. 3d 161, 165 (D. Mass. 2017). The court then ordered a status

summary judgment on all three remaining claims.  This timely appeal followed.  On appeal, the parties stipulated to the dismissal of Thomas's claims against Salisbury and Harrington as to Count 1.

## III. Analysis

This court reviews grants of summary judgment de novo, viewing the record and all reasonable inferences to be drawn therefrom in the light most favorable to the non-moving party. See Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 223 (1st Cir. 2013).  Summary judgment is warranted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (internal quotations marks omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  Id. at 256-57.

---

conference for the parties to discuss whether the remaining state law claims should be remanded to state court in light of Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017) ("[I]t can be an abuse of discretion -- if no federal claim remains -- for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts.").  Thereafter, all parties agreed that the district court could retain jurisdiction and resolve the remaining claims. See Thomas v. Town of Salisbury, 284 F. Supp. 3d 66, 69 (D. Mass. 2018).

## A.    Civil Conspiracy

Thomas first contends that the district court erred in granting summary judgment on his conspiracy claim because there was evidence "that Harrington and St. Pierre had a common plan to deprive [him] of his . . . property right of employment, . . . and took affirmative steps to achieve the desired result."  He argues that the district court failed to consider evidence that, viewed in its totality, would permit a jury to infer the existence of a conspiracy.  He primarily relies on: (1) the existence of Harrington and St. Pierre's prior work relationship; (2) Harrington's alleged control over the investigative process, as demonstrated through communications between him and St. Pierre; and (3) alleged irregularities that arose during St. Pierre's investigation.

In Massachusetts, civil conspiracy may take the form of "'concerted action,' whereby liability is imposed on one individual for the tort of another."[8]  Kurker v. Hill, 689 N.E.2d 833, 836 (Mass. App. Ct. 1998).  "Because it is vicarious liability, this type of civil conspiracy requires an underlying

---

[8] Massachusetts also recognizes another form of civil conspiracy where "defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently."  Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994) (internal quotation marks and citation omitted).  However, because Thomas's briefs explicitly rely on the "concerted action" theory of conspiracy, we need not address this alternative form of conspiracy.

- 12 -

tort [and t]he conspiracy consists in agreeing to, or assisting in, this underlying tort."  Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009) (citations omitted).  To prove a "concerted action" conspiracy, a plaintiff must show that defendants either (1) acted "in concert with or pursuant to a common design with" the tortfeasor or (2) "gave substantial assistance to" the tortfeasor's conduct.[9]  Kyte v. Phillip Morris Inc., 556 N.E.2d 1025, 1027 (Mass. 1990); see also Taylor, 576 F.3d at 35 ("Massachusetts courts have recognized two theories of liability under [Restatement (Second of Torts)] section 876: (1) 'concert of action,' and (2) 'substantial assistance' or 'aiding and abetting.'").

Under the "common design" theory, a plaintiff must show "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement."  Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994).  "[A]n inference of an implied agreement [can] properly be drawn from the conduct of two or more parties."  Kyte, 556 N.E.2d at 1028.

---

[9]  Thomas appears to mistakenly conflate these two alternatives, treating them as necessary elements of "concerted action" liability.

- 13 -

By contrast, under the "substantial assistance" theory, "a person may be liable in tort if he 'knows that the . . . conduct [of another person] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'" Kurker, 689 N.E.2d at 837 (quoting Restatement (Second) of Torts § 876(b) (1977)) (alterations in original); see also Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 81 N.E.3d 782, 793 (Mass. App. Ct. 2017) ("The claim for civil conspiracy . . . requires a showing that the defendants (1) knew that the conduct of [others] constituted a breach of fiduciary duty and (2) substantially assisted in or encouraged that conduct."). "Key to this cause of action is a defendant's substantial assistance, [given] with the knowledge that such assistance is contributing to a common tortious plan." Kurker, 689 N.E.2d at 837. Moreover, liability under this theory only applies to "assistance or encouragement that is a 'substantial factor in causing the resulting tort.'" Taylor, 576 F.3d at 35 (quoting Restatement (Second) of Torts § 876 cmt. d.). In addition, the plaintiff must also establish that the defendant had an "unlawful intent," consisting of both "knowledge that the other's conduct is tortious[] and an intent to substantially assist or encourage that conduct." Id.; see also Kyte, 556 N.E.2d at 1028 ("Evidence of the defendant's knowledge of its substantial, supporting role in an unlawful enterprise is required."). Merely showing the

- 14 -

defendant's "general awareness" that their ostensible co-conspirator is engaged in tortious acts is insufficient. Kyte, 556 N.E.2d at 1028. The plaintiff need not, however, provide evidence of an agreement between the defendant and the tortfeasor. Taylor, 576 F.3d at 35-36.

Thomas's argument fails under either theory. With respect to the "common design" theory, the evidence on which Thomas relies falls well short of supporting an inference of an agreement between Harrington and St. Pierre to terminate his employment. For example, Thomas notes that Harrington, without the Board of Selectmen's prior knowledge,[10] solicited St. Pierre to conduct the L'Esperance investigation. From that and subsequent communications between the two, he infers that Harrington controlled the course of the investigation, including its eventual discovery of evidence against Thomas. While the record contains communications between Harrington and St. Pierre, they only demonstrate that both men believed that there was good cause to terminate Thomas's employment.[11] There is no suggestion that Harrington controlled or otherwise directed St. Pierre's work. In addition, while such communications show that Harrington was

---

[10] In any event, the Board of Selectmen ultimately approved the investigation into Thomas.

[11] Notably, Thomas does not dispute that defendants had cause to investigate him.

- 15 -

"generally aware[]" of the investigation's progress, they do not rise to the level necessary to impose liability under the common design theory.  Kyte, 556 N.E.2d at 1028; cf. Aetna Cas. Sur. Co., 43 F.3d at 1564-65 (reasonable to infer concerted action from repeated pattern of misstatements).

Thomas's argument that St. Pierre provided "substantial assistance" to tortious acts against him is equally unavailing. Thomas emphasizes that during the investigations into himself and L'Esperance, St. Pierre attempted to unduly "influence" the testimony of SPD officers.[12]  Even assuming that Harrington sought to remove Thomas from the SPD prior to the investigations,[13] there is no evidence from which to infer that St. Pierre was aware of that wrongful purpose.  See Taylor, 576 F.3d at 35 (requiring, inter alia, "knowledge that the other's conduct is tortious"). The evidence only shows that St. Pierre was retained by the Board of Selectmen to investigate Thomas and that he communicated with Harrington, the town manager, during that investigation.  While, as the district court noted, Harrington may have encouraged St.

---

[12] Thomas alleges that Sforza continued to participate in the Thomas investigation despite being removed.  However, he fails to connect Sforza's purported wrongful involvement to either Harrington or St. Pierre.

[13] As discussed earlier, a "concerted effort" conspiracy requires an underlying tortious act.  See Taylor, 576 F.3d at 35. Although Thomas does not explicitly identify a tortious act, Harrington's decision to terminate Thomas is the only plausible candidate.

Pierre to "dig deep" for facts against Thomas, Thomas v. Town of Salisbury, 284 F. Supp. 3d 66, 79 (D. Mass. 2018), that alone is insufficient to support a finding that St. Pierre was aware of Harrington's alleged tortious purpose. Cf. Grant v. John Hancock Mut. Life. Ins. Co., 183 F. Supp. 2d 344, 363-64 (D. Mass. 2002) (granting summary judgment on concerted action conspiracy on the reasoning that "[b]ecause a conspiracy requires an agreement to commit a wrongful act, none can exist where an alleged participant lacks knowledge that a wrongful act is being perpetrated[]").

In short, there is insufficient evidence for a reasonable jury to infer the existence of a conspiracy between Harrington and St. Pierre. Accordingly, we affirm the district court's grant of summary judgment on that claim.

### B. Massachusetts Civil Rights Act

Thomas also contends that the district court erred in dismissing his MCRA claim against Harrington.[14] As noted, the MCRA provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitutions or laws has been interfered with by "threats, intimidation or coercion." Mass. Gen. Laws ch. 12, §§ 11H, 11I. A "threat" means "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" means "putting in

_____

[14] The MCRA claim is not brought against St. Pierre.

- 17 -

fear for the purpose of compelling or deterring conduct"; and "coercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994). "[T]he MCRA contemplates a two-part sequence: [liability may be found where] (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that [she] has the constitutional right to do." Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009).

Here, the parties do not dispute that Thomas's continued employment with the SPD constituted a constitutionally protected property interest.[15] Accordingly, the only question with respect to the MCRA claim is whether Harrington engaged in "threats, intimidation, or coercion."

It is rare for a MCRA claim to involve no physical threat of harm. Although "purely economic pressures may constitute actionable coercion under the MCRA," "the exception for claims based on non-physical coercion remains a narrow one." Nolan v. CN8, 656 F.3d 71, 77-78 (1st Cir. 2011) (quotation marks and citations omitted). Massachusetts courts have required "a pattern

_____

[15] It appears that Thomas is asserting a procedural due process claim. See Costa-Urena v. Segarra, 590 F.3d 18, 26 (1st Cir. 2009).

- 18 -

of harassment and intimidation" to support a finding of non-physical coercion under the MCRA.  See Howcroft v. City of Peabody, 747 N.E.2d 729, 746 (Mass. App. Ct. 2001) (finding repeated verbal harassment, relocation of work site, and multiple failed attempts to suspend plaintiff without pay and deprive him of benefits supported a MCRA claim).  However, "by itself, a threat to use lawful means to reach an intended result is not actionable under [the MCRA]."  Buster v. George W. Moore, Inc., 783 N.E.2d 399, 411 (Mass. 2003).

Thomas contends that Harrington violated the MCRA by forcing him to leave the SPD.  In support, Thomas notes that Harrington disseminated St. Pierre's investigatory report to a local newspaper, possibly disclosed it to the Massachusetts Board of Bar Overseers, and "steer[ed]" Fowler into forbidding him from practicing law.  Thomas has waived some of these points by failing to raise or develop them below.  See Thomas, 284 F. Supp. 3d at 78 & n.13.  However, even taking these arguments at face value, the events to which Thomas points fall well short of the MCRA's coercion requirement.  First, as the district court noted, the dissemination to the local newspaper was in response to a FOIA request.  Id.  Second, Thomas's allegation that Harrington submitted the report to the Board of Bar Overseers suffers from fatal flaws -- he does not show how, given the record here, this filing could constitute "threats, coercion, or intimidation."

- 19 -

And, his unsupported allegations are no more than that -- mere allegations. And third, the record shows not only that Fowler unilaterally implemented the policy restricting officers moonlighting as practicing attorneys, but also that the policy was narrowly tailored to ensure that officers avoided any conflicts of interest.[16] These events hardly evince a "pattern of harassment and intimidation" geared towards coercing Thomas's resignation from the SPD.[17]

Interpreted liberally, the evidence plausibly suggests that Harrington wanted to see Thomas leave the SPD. However, as we have stated, "the exception for [MCRA] claims based on non-physical coercion remains a narrow one," and it should not be invoked unless the record "resembl[es] the sort of physical, moral, or economic pressure that courts have found sufficient to support

_____

[16] The fact that the investigation caused Thomas to "strongly contemplate[] leaving his employ," is of no avail where he does not dispute that Harrington had cause for initiating the investigation. This is true even though an arbitrator ultimately reversed Harrington's decision to terminate his employment. See Tracey v. Champeon, 79 N.E.3d 1111 (Table) (Mass. App. Ct. 2017) (unpublished) (rejecting economic coercion theory under the MCRA where plaintiff's suspension was reversed by an arbitrator).

[17] Thomas further alleges that subsequent to the filing of the instant suit, Harrington interfered with the sale of his Salisbury home. Specifically, he notes that Harrington contacted the Salisbury building inspector and directed him to investigate whether Thomas's home violated any zoning laws. Thomas contends that this prevented him from selling his home. However, because that incident occurred well after Thomas retired, it cannot have interfered with his right to continued employment with the SPD.

a claim under this statute."  Meuser v. Fed. Express Corp., 564 F.3d 507, 519 (1st Cir. 2009) (quotation marks and citation omitted).  This is not one of those circumstances.  Therefore, we affirm the district court's grant of summary judgment on Thomas's MCRA claim against Harrington.[18]

## IV.  Conclusion

For the foregoing reasons, the district court's grant of summary judgment is AFFIRMED.

---

[18] Because the evidence fails to support a finding that Harrington violated the MCRA, we need not address his qualified immunity argument.